UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 19-cr-86 (DWF/LIB) (1) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Pierre Cornelius Stewart, | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, and upon Pierre Cornelius Stewart's (hereinafter "Defendant") Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 21].

The Court held a motions hearing on May 23, 2019, regarding the parties' pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing, and the Court took Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 21], under advisement on June 14, 2019.[2]

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 21], be **DENIED**.

---

[1] The Court addressed the Government's pretrial motions for discovery and production of evidence by separate Order. [Docket No. 34].

[2] The Government untimely filed its opposition to Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 21], on June 21, 2019. [Docket No. 40]. Defendant did not object to the Government's untimely filing and the Court permitted the untimely filing. [Docket No. 41].

I. **BACKGROUND AND STATEMENT OF FACTS**

A. **Background**

On March 20, 2019, Defendant was indicted with one count of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846; and one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2. (Indictment [Docket No. 1]).

B. **Facts[3]**

In his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 21], Defendant moves the Court to find that the stop of the motor vehicle he was a passenger in on September 14, 2018, in Onamia, Minnesota was unlawful, and that all evidence seized as a result of that stop be suppressed. (Mem. in Supp., [Docket No. 36], at 1).

The record presently before the Court indicates that on September 14, 2018, at approximately 12:17 p.m., Trooper Otterson was talking to the driver of a red SUV that he had pulled over in the parking lot of the "Grand Market" located in the city of Onamia, Minnesota. (Gov't Ex. 1 at 0:00–0:30).[4] While Trooper Otterson was talking to the driver of the red SUV, he saw a female exit from the driver's seat of a white GMC Yukon (hereinafter "Defendant's vehicle"), which was also parked nearby in the same parking lot as the red SUV. (May 23, 2019, Motions Hearing, Digital Recording at 10:22–10:23 a.m.). Trooper Otterson observed the female approach from the passenger's side of his police vehicle, towards where he was talking to the driver of the red SUV. (Id.). After the female got within 10 to 15 feet of Trooper Otterson, she

---

[3] Except where expressly indicated otherwise, the Court's statement of facts is derived from the testimony of Minnesota State Trooper Nicholas Otterson at the May 23, 2019, motions hearing, and from Government's Exhibit 1, which is a dashboard and interior video recording from Trooper Otterson's police vehicle. At the motions hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 1. (May 23, 2019, Motions Hearing, Digital Recording at 10:20–10:21 a m.).

[4] When the video recording begins, Trooper Otterson can be heard standing outside of his police vehicle talking to the driver of the red SUV. (See, Gov't Ex. 1 at 0:00–0:15).

appeared to notice him talking to the driver of the red SUV. (Id.). Upon observing Trooper Otterson, the female turned around and walked back to the Defendant's vehicle where she got into the driver's seat. (Id.). Based on his training and experience, Trooper Otterson believed that the female was attempting to complete a hand-to-hand drug transaction with the driver of the red SUV. (Id. at 10:23–10:24 a.m.).

After the female got back into the driver's seat of the Defendant's vehicle, which was on the side closest to Trooper Otterson, the female began driving the vehicle out of the parking lot. (Id.). When pulling the Defendant's vehicle out of the parking lot, the female pulled the vehicle forward out of its parking spot, turned right two times to turn the vehicle around to access a lot exit, and then drove past where Trooper Otterson was standing and talking to the driver of the red SUV. (Id.). At 0:37 of the video recording, the Defendant's vehicle becomes visible in the recording and can be seen driving past Trooper Otterson towards the exit of the parking lot, with the passenger's side of the Defendant's vehicle facing Trooper Otterson. (Gov't Ex. 1 at 0:30–0:40). Trooper Otterson is not visible in the video recording when the Defendant's vehicle passes his patrol vehicle. (Id.). As the Defendant's vehicle drove past him, Trooper Otterson testified that he observed that Defendant was not wearing a seatbelt. (May 23, 2019, Motions Hearing, Digital Recording at 10:23–10:24 a.m.). Trooper Otterson also observed that the Defendant's vehicle did not have a front or rear license plate, as well as, that the rear windshield had a dark tint and did not appear to have a temporary tag on it. (Id. at 10:28–10:29 a.m.). Based on his observations, Trooper Otterson believed the Defendant's vehicle was in violation of multiple Minnesota traffic laws. (Id.).

After observing that the Defendant's vehicle was potentially violating Minnesota traffic law, Trooper Otterson immediately ended his conversation with the driver red SUV and, at

3

approximately 0:41 of the video recording, Trooper Otterson thereafter becomes visible in the video recording as he got into his patrol vehicle to begin following the Defendant's vehicle. (See, Gov't Ex. 1). While Trooper Otterson began to follow the Defendant's vehicle, he testified that he observed what he perceived to be Defendant's vehicle moving at a high rate of speed toward the exit of the parking lot. (Id.).

When the Defendant's vehicle turned right out of the parking lot, Trooper Otterson briefly lost sight of the vehicle. (Id.). When Trooper Otterson also turned right out of the parking lot and the Defendant's vehicle again became visible in the video recording, Trooper Otterson testified that he observed that the vehicle was stopped at a stop sign approximately 300 to 400 yards away without a turn signal on. (Id. at 10:30–10:31 a.m.). He then observed that the Defendant's vehicle turned on its right turn signal, and then turned right. (Id.). Based on this observation, Trooper Otterson deduced that the vehicle had failed to continuously signal 100 feet before turning, which he believed to also be a violation of Minnesota traffic law. (Id.). According to the audio of the police vehicle dashcam, Trooper Otterson contemporaneously commented about not seeing that the vehicle had employed its turn signal. (Gov't Ex. 1 at 0:50–1:05). The video recording shows the Defendant's vehicle was stopped at the intersection for approximately 6 seconds before turning. (Gov't Ex. 1 at 1:00–1:07). The video recording does not show whether the Defendant's vehicle's turn signal was on during the 100 feet prior to its approach to the stop sign. (Id.).

Thereafter, at approximately 12:19 p.m., Trooper Otterson turned on the lights of his police vehicle, initiated a traffic stop of the Defendant's vehicle, and pulled the vehicle over. (May 23, 2019, Motions Hearing, Digital Recording at 10:32–10:33 a.m.; Gov't Ex. 1 at 1:00–2:00). Trooper Otterson also testified that the vehicle did not pull over right away. (May 23, 2019, Motions Hearing, Digital Recording at 10:32–10:33 a.m.).

After Trooper Otterson pulled the Defendant's vehicle over, he asked the female driver if she had her driver's license with her and she stated she did not. (Gov't. Ex. 1 at 2:05–2:15). Trooper Otterson then told the occupants of the Defendant's vehicle that he pulled them over because they failed to continuously signal for 100 feet before turning. (Id. at 2:30–2:45).

Defendant then informed Trooper Otterson that he owned the vehicle. (Id. at 3:20–3:27). Trooper Otterson then walked around to the driver's side of the vehicle and while doing so, observed drug paraphernalia in the backseat of the vehicle. (Id. at 5:00–6:00). Trooper Otterson then asked the female driver to walk to his police vehicle so he could identify her because she did not have any form of identification on her. (Id. at 6:00–6:45).

After briefly questioning the female driver, Trooper Otterson then walked back to the Defendant's vehicle to talk to the Defendant. (Id. at 9:00–13:30). While Trooper Otterson was talking to Defendant, Defendant told him that he had weed on him. (Id. at 16:30–17:00). Thereafter, Trooper Otterson handcuffed Defendant and put him in the backseat of his police vehicle. (Id. at 19:00–20:10).

Trooper Otterson then commenced a dog sniff search and the drug dog alerted that there were drugs in the Defendant's vehicle. (Id. at 21:15–21:45). Thereafter, Trooper Otterson searched the vehicle and found heroin. (Id. at 38:45–39:10).

## II. DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 21].

### A. Traffic Stop

Defendant moves the Court to suppress all evidence obtained as a result of the September 14, 2018, traffic stop of the Defendant's vehicle, solely arguing that there was not reasonable,

articulable suspicion to make the initial stop of Defendant's vehicle.[5]

### B.    Standard of Review[6]

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported by at least a reasonable, articulable suspicion that a crime is being committed. Jones, 269 F.3d at 924 (citing Prouse, 440 U.S. at 663). Furthermore, it is well-established that any traffic violation, no matter how minor, will provide probable cause to justify a traffic stop. See, e.g., United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008); United States v. Coney, 456 F.3d 850, 855–56 (8th Cir. 2006) ("An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation.").[7]

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, the scope of which must be reasonably related to the circumstances which gave rise to the stop. Rodriguez, 135 S. Ct. at 1614; Terry v. Ohio, 392 U.S. 1, 20 (1968); See also, United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991). A court reviewing

---

[5] At the motions hearing, the Government conceded that Defendant had standing to challenge the September 14, 2018, traffic stop. (May 23, 2019, Motions Hearing, Digital Recording at 10:15–10:16 a m.).

[6] At the motions hearing, Defendant withdrew his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 21], to the extent he argued that the frisk of Defendant by Trooper Otterson was unlawful, to the extent that he argued that the dog sniff around the exterior of the vehicle was unreasonable, and to the extent he argued that the warrantless search of the vehicle was unreasonable. (May 23, 2019, Motions Hearing, Digital Recording at 10:14–10:15 a.m.). Accordingly, Defendant only challenges whether Trooper Otterson had a reasonable, articulable suspicion for the initial traffic stop of the vehicle in which Defendant was a passenger.

[7] It is also well-established that other subjective suspicious activity does not change the objective analysis of whether an officer had a reasonable, articulable suspicion for the initial traffic stop. See, e.g., United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) ("An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation.") (internal citations omitted).

the validity of an initial stop examines whether an officer's actions were objectively reasonable under the circumstances reasonably known to the officer at the time. United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).[8]

### C. Analysis

Defendant argues that the vehicle he was riding in as a passenger was not initially stopped for a valid traffic law violation on September 14, 2018, because Trooper Otterson's testimony was unsupported by the patrol car video recording. (Mem. in Supp., [Docket No. 21], at 1).

A traffic stop generally must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is taking place. United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). In considering the lawfulness of a traffic stop, the heart of the question is whether the officer had an objectively reasonable basis for the stop. United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005); See also, United States v. Robledo, No. 06-cr-1439, 2006 WL 1686771, at *1 (8th Cir. June 21, 2006) (unpublished opinion). Expressed in another way, when an officer's observations lead him to reasonably suspect that an individual is engaged in criminal activity, the officer may stop that person to investigate the circumstances that provoke the suspicion, and an objectively reasonable basis to stop exists if the officer reasonably suspects that the driver was operating the vehicle in a manner that did not comply with state law. Smart, 393 F.3d at 770. As noted above, a traffic violation, however minor, is sufficient to justify an initial stop of a vehicle. Martin, 411 F.3d at 1000.[9]

---

[8] In cases involving a mistake of law or fact, the Court simply evaluates whether the mistake was an objectively reasonable one under the circumstances. Smart, 393 F.3d at 770

[9] This is the case even where the officer's suspicion was based upon a mistaken belief as to either law or fact, so long as the mistake itself was objectively reasonable. Smart, 393 F.3d at 770 (reasonable suspicion exists despite mistake of fact as to the state license plate on the vehicle and mistake of law as to the state's requirement for front and back plates). On the other hand, subjective good faith alone is not sufficient to justify a traffic stop because "officers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable." Martin, 411 F.3d at 1001; See also, United States v. Billups, 442 F. Supp. 2d 697, 707–08 (D. Minn. 2006).

7

Here, Defendant argues that the multiple claimed basis for the September 14, 2018, traffic stop were unsupported by the video recording from Trooper Otterson's police vehicle and that the recording, in fact, contradicts Trooper Otterson's testimony regarding his stated basis for stopping the Defendant's vehicle. (Mem. in Supp., [Docket No. 36], at 7). Specifically, Defendant contends that the video recordings did not support Trooper Otterson's testimony that Defendant was not wearing a seatbelt, that the vehicle did not have a temporary tag displayed in the rear windshield, that the vehicle failed to continuously signal for 100 feet before turning, that the female did not abruptly turn around and walk back to the vehicle upon seeing Trooper Otterson, and that the vehicle did not exit the parking lot at a high rate of speed. (Id.).[10]

The Court finds credible Trooper Otterson's testimony that Defendant was not wearing a seatbelt while in the passenger's seat of his vehicle. Defendant argues that the video recordings from Trooper Otterson's police vehicle "establish[] that Trooper Otterson could not have seen [Defendant] in the front passenger seat of the white Yukon as it drove behind his squad [car] as he was not looking in that direction." (Id. at 10).

In Minnesota, failing to wear a seatbelt is an independent traffic violation that will justify initiating a traffic stop of the vehicle. See, M.S.A. § 169.686; United States v. Alonzo, No. 15-cr-165 (JRT/LIB), 2016 WL 1531522, at *5 (D. Minn. Apr. 15, 2016); State v. Wendorf, 814 N.W.2d 359, 361-62 (Minn. Ct. App. 2012).

Upon reviewing the video recording, despite Defendant's argument, it does not establish that Trooper Otterson could not have seen that Defendant was not wearing a seatbelt, nor does it establish that Trooper Otterson was not looking in the direction of the Defendant's vehicle when it passed near his patrol vehicle. The Trooper was in the process of getting back in his patrol vehicle

---

[10] For purposes of the present motion, it is not necessary that the Court find reasonable articulable suspicion exists for each of the proffered set of circumstances.

as Defendant's vehicle passed, and the video recording does not necessarily represent where Trooper Otterson was looking when the Defendant's vehicle began to pass near his patrol vehicle because he is not visible in the recording at that time. At 0:37 of the recording, the vehicle becomes visible in the recording and, at approximately 0:41 of the recording, Trooper Otterson becomes visible in the recording as he gets into his patrol vehicle to begin following the vehicle. (See, Gov't Ex. 1). Thus, contrary to Defendant's argument, it is not "impossible" for Trooper Otterson to have seen whether or not Defendant was wearing a seatbelt. Furthermore, even though Trooper Otterson was not visible in the recording, given that he testified about watching the female get back into the Defendant's vehicle because he thought her actions were suspicious makes it even more likely that he was already looking at the Defendant's vehicle and its occupants as it passed. Accordingly, on the whole of the present record, the Court finds credible Trooper Otterson's testimony that he believed he observed that Defendant was not wearing a seatbelt, and therefore, Trooper Otterson had, on the present record a reasonable, articulable basis to conduct a traffic stop of the vehicle Defendant was riding in as a passenger.

Defendant also argues that based on Trooper Otterson's positioning, "[he] would not have been in a position to say one [way] or another whether or not there was a temporary license sticker on the [Defendant's] vehicle until after he had affected the stop." (Mem. in Supp., [Docket No. 36], at 7). Again, nothing about the video recording refutes Trooper Otterson's testimony that he observed that when the Defendant's vehicle drove past him that the vehicle did not have a front or rear license plate and did not appear to have a temporary tag in its rear windshield. In fact, when Trooper Otterson caught up to the Defendant's vehicle, the video recording shows that the Defendant's vehicle did not have a rear license plate, nor did it appear to have a temporary tag

9

displayed in its rear windshield. (Gov't Ex. 1 at 1:00–2:00). Accordingly, the Court finds Trooper Otterson's testimony regarding the vehicle's lack of license plate and temporary tag credible.

In Minnesota, failing to properly register a vehicle is an independent traffic violation that will justify initiating a traffic stop of the vehicle. See, M.S.A. § 168.35; State v. Hansen, No. A12-1277, 2013 WL 3491048, at *1 (Minn. Ct. App. July 15, 2013). Therefore, Trooper Otterson lawfully had a reasonable, articulable basis to initially stop Defendant's vehicle on this basis.

Furthermore, to the extent that Defendant argues that the video recording does not corroborate Trooper Otterson's testimony that the vehicle failed to signal that it was turning at least 100 feet before the stop sign, Defendant's argument is likewise unpersuasive.

Defendant argues that in the recording, the right turn signal of the vehicle can be seen flashing as the vehicle turns right. (Mem. in Supp., [Docket No. 36], at 10). Based on this, and based on the fact that Trooper Otterson testified that he briefly lost sight of the vehicle when it first exited the parking lot, Defendant argues that Trooper Otterson did not see the Defendant's vehicle as it was approaching over the last 100 feet before the intersection, and therefore, he could not have seen whether or not the vehicle had its turn signal on during that 100 feet. (Id.). However, contrary to Defendant's argument, while the video recording does not show that Trooper Otterson could have seen whether the Defendant's vehicle did or did not have its turn signal on during the last 100 feet as it approached the stop sign, the video recording does show that the vehicle was visibly stopped at the intersection for approximately 6 seconds before turning, (Gov't Ex. 1 at 1:00–1:07), and there is nothing on the video to refute Trooper Otterson's testimony that the vehicle did not have its turn signal on while he observed it stopped at the stop sign during those 6 seconds before it actually turned. Accordingly, the Court finds credible Trooper Otterson's

testimony regarding his belief that it was likely the Defendant's vehicle failed to signal continuously 100 feet before turning.

In Minnesota, failing to continuously signal 100 feet before turning is an independent traffic violation that will justify initiating a traffic stop of the vehicle. See, M.S.A. § 169.19; State v. Giles, No. A18-0803, 2019 WL 1758003, at *3 (Minn. Ct. App. Apr. 22, 2019). Accordingly, Trooper Otterson had an objectively reasonable belief to lawfully stop the vehicle Defendant was a passenger in on that basis.

As previously discussed, a single minor traffic violation gives an officer probable cause to conduct an initial traffic stop. Coney, 456 F.3d at 855–56 ("An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation."). In the present case, the Court found credible Trooper Otterson's testimony that he had an objective reasonable belief that he observed multiple violations of Minnesota traffic laws, any one of which made Trooper Otterson's initial traffic stop of the Defendant's vehicle constitutional.[11]

Defendant further argues that other aspects of Trooper Otterson's hearing testimony should discredit overall his testimony regarding the Minnesota traffic law violations he reportedly observed. Defendant's arguments, however, are unpersuasive.

Defendant first argues that Trooper Otterson's testimony regarding suspicious conduct of the female driving the Defendant's vehicle should be disbelieved because "[s]quad video camera 1 would have captured the female approaching the red SUV if it ever happened." (Mem. in Supp., [Docket No. 36], at 11). Defendant's representation, however, is unsupported by the video recording. Video Camera 1 was angled so that it was recording everything directly in front of the

---

[11] It is not necessary that all of the traffic violations discussed thus far exist to make the initial traffic stop constitutional; finding that even one presented a reasonable, articulable belief of a traffic violation is sufficient to support the stop at issue.

police vehicle, and Video Camera 2 only recorded the inside of the police vehicle, as well as, narrowly outside the back window of the police vehicle. (See, Gov't Ex. 1). Thus, neither recording would have recorded the female driver of Defendant's vehicle who Trooper Otterson testified was approaching him from the passenger's side of his police vehicle. (May 23, 2019, Motions Hearing, Digital Recording at 10:22–10:23 a.m.). Accordingly, to the extent Defendant argues that the squad video renders Trooper Otterson's testimony regarding the female driver of the Defendant's vehicle incredible, his argument is unpersuasive.

Defendant also argues that Trooper Otterson could not have observed that the Defendant's vehicle drove away at what he believed to be a high rate of speed. As previously discussed, there is no video evidence refuting Trooper Otterson's testimony that he had observed the vehicle going quickly out of the parking lot or that he was able to watch the Defendant's vehicle exit the parking lot.

Accordingly, neither of Defendant's arguments about other aspects of Trooper Otterson's hearing testimony detract from the credibility of the three previously discussed reasonable, articulable basis for the initial traffic stop on September 14, 2018 of the Defendant's vehicle as expressed by Trooper Otterson.

Defendant concedes that if the Court accepts as credible the testimony of Trooper Otterson, then there was reasonable, articulable suspicion to justify the initial traffic stop of the Defendant's vehicle. (Mem. in Supp., [Docket No. 36], at 9). As already observed above, the Court does find that Trooper Otterson's hearing testimony is credible, and that there was reasonable, articulable suspicion to justify the initial stop of the Defendant's vehicle on September 14, 2018.

Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained Through Illegal Search and Seizure, [Docket No. 21], to the extent that

Defendant seeks to suppress evidence obtained as a subsequent consequence of the September 14, 2018, traffic stop.

## IV. CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 21], be **DENIED**, as set forth above.


Dated: July 15, 2019                              s/Leo I. Brisbois
                                                  Leo I. Brisbois
                                                  U.S. MAGISTRATE JUDGE


**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.